UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

CLAUDE BLATCHER                                    CIVIL ACTION

VERSUS                                             NO. 05-105

DEPUTY DONALD JACOBS ET AL.                        SECTION "I" (2)

## FINDINGS AND RECOMMENDATION

Plaintiff, Claude Blatcher, is a convicted inmate currently incarcerated in the LaSalle Correctional Center in Olla, Louisiana.  He filed this complaint pro se and in forma pauperis pursuant to 42 U.S.C. § 1983.  The remaining defendants on the date of trial/evidentiary hearing were Tangipahoa Parish Sheriff's Deputy Donald Jacob,[1] Deputy Michael Cowart, Sergeant Lavoice Harvey and Arthur Mauterer, M.D., a physician who provides medical services at the Tangipahoa Parish Jail.  Blatcher alleges that, while he was incarcerated in the jail in October 2004, he was attacked and beaten by the deputies and that Dr. Mauterer failed to provide him with adequate medical care for his injuries.

_____

[1]Although the pleadings and much of the testimony refer to this deputy as "Jacobs," he testified that there is no "s" on the end of his name.

Trial/evidentiary hearing was conducted on March 2, 2006 before the undersigned magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 73.3E.  Plaintiff appeared pro se and participated by telephone.  Russell Rudolph, appearing in person, represented the deputy defendants.  Paul Deal and Phyllis Glazer, appearing in person, represented Dr. Mauterer.

For the following reasons, **IT IS RECOMMENDED** that plaintiff's claims be **DISMISSED WITH PREJUDICE**.

I.   EVIDENCE AT TRIAL

Plaintiff's witnesses, Jason Addison and Alvin Irving Jr., participated and testified by telephone.  42 U.S.C. § 1997e(f)(1).  Deputy Jacob, Sergeant Harvey and Dr. Mauterer appeared in person.

The following is a summary of the evidence offered at trial:

A.   Plaintiff's Case-in-Chief Witness Testimony

1.   *Plaintiff's Testimony*

Blatcher  testified that he is incarcerated at LaSalle Correctional facility, in Olla, LaSalle Parish, Louisiana, having been convicted in Tangipahoa Parish of armed robbery on November 22, 2005.  Blatcher stated that he was sentenced to ten years in prison.

Plaintiff said that, on October 7, 2004, he had been awaiting trial at the Tangipahoa Parish Jail on a charge of armed robbery.  He confirmed that his claims in

this case are that he was subjected to excessive force and inadequate medical care following the incident.

As to his first claim of excessive force, Blatcher testified that, on October 7, 2004, Sgt. Harvey came to his cell along with Deputies Cowart and Jacob for a routine "shakedown." Plaintiff described the shakedown as a routine security procedure during which deputies search a prisoner's belongings and cell for contraband. He said that if the deputies find any contraband, they take it away from the prisoner. Blatcher stated that shakedowns did not occur often. He testified that he only witnessed four shakedowns during his year and one-half incarceration at Tangipahoa Parish jail.

Blatcher stated that he shared his cell with Alvin Irving. He testified that, at the time of the incident, Sgt. Harvey instructed him and Irving to exit the cell and stand with their hands on the wall so that the deputies could perform their search. Blatcher testified that both men followed the deputies' orders.

Plaintiff stated that, once they were outside the cell, Deputy Cowart began speaking to him in a belligerent manner for no reason, telling him "get your hands on the f---in' wall." He testified that he asked the deputies why he was being treated this way, but that Deputy Cowart continued to search and curse him.

Blatcher admitted that his left fist was balled up during the search and that Deputy Cowart asked to see what was in his hand. He testified that the only thing in his hand

3

was a candy wrapper.  He stated that, although he opened his hand and Deputy Cowart could see the candy wrapper, the deputy slammed plaintiff's hand against the wall. Blatcher testified that he protested that he did not need to be handled that way and he asked that someone else search him.

Plaintiff testified that he was immediately pulled off the wall, although he had his hands spread against the wall.  He said that Deputy Jacob ran out of the cell and punched him in the mouth, which started bleeding.  He stated that Deputy Jacob hit him in the eye and that someone put a knee to his throat.  He could not identify who put a knee to his throat because he said his eyes were closed at this point.  Blatcher testified that Deputy Cowart began pulling his hair "as if he was trying to pull the hair out of my head."

Plaintiff stated that Deputy Cowart told him to get on the ground and pushed him onto the ground, where his face was in his own blood, and that Deputy Cowart was still yanking on his hair.  Blatcher testified that Deputy Cowart said, "let's get him the f--- out of here," and the deputies rushed him out to booking.

Blatcher testified that Deputy Cowart continued to pull on his hair and pulled back on his neck so hard that he could not breathe and felt like he was going to pass out. Plaintiff said that Deputy Cowart walked him to booking while holding him by the neck and threw him down onto a bench, where he hit his lower spine on a corner of the bench. He testified that the entire incident lasted about 35 minutes.

4

Blatcher said he suffered the following injuries from the incident:  (1) eye sensitivity to light and sharp pain in the middle of his right eye when he moved it, (2) numbness in his head that later subsided, (3) lower neck pain, (4) lower back pain that made it hard to sit or stand, (5) a re-sprained ankle, (6) cuts in his mouth and (7) a big gash on his lip.

As to his second claim of inadequate medical care, plaintiff testified that he spent 10 to 15 minutes in solitary confinement after the beating incident and then was called to the nurse's office.  He stated that Nurse Nancy Charlotte Lee and Warden Randy Pinion were in the office.  Blatcher said he told them he needed to go to the hospital, but Lee told him he did not need treatment and sent him back to solitary confinement after about two minutes.  He stated that he filled out a medical request form that same day, describing everything that was wrong with him.

Blatcher testified that he was seen by Dr. Mauterer and Nurse Lee at the jail infirmary on October 8, 2004.  He stated that Dr. Mauterer made comments that did not pertain to the situation, did not listen to him, did not allow him to explain all of his injuries and told him that soreness goes away.  Plaintiff testified that Dr. Mauterer did not touch him or examine him in any way before sending him back to his cell.  He stated that he received no treatment.

Blatcher testified that he filled out another medical request form on October 12, 2004, explaining that he was in pain, and he was again seen by Dr. Mauterer and Nurse Lee. He stated that Dr. Mauterer again did not touch him and did not take him seriously. He said his request to go to the hospital was denied.

Blatcher testified that he did not visit the infirmary again. He said that filling out medical request forms did no good and he was not going to receive any treatment, so he stopped asking. He stated that the cuts in his mouth healed in about a week and that the injury to his ankle took about two weeks to heal.

Plaintiff testified that he still has frequent headaches and the top of his head is still sore, although he does not know if it is the result of the October 7th incident. He stated that it hurts to comb the top of his head. He testified that the pain in his eyes went away, but he started to see double after the incident and now finds it hard to read. He said he still has problems with the bottom of his neck and lower back. He stated that it is hard for him to sit for long periods of time and to stand up from a sitting position. He testified that he has not received or requested any treatment for his eyes, back or neck at either Tangipahoa Parish or LaSalle jail since October 12, 2004.

He stated that Dr. Mauterer's prescription of antidepressant medication had nothing to do with his injuries from the beating, but that the medication had been ordered by the judge in his state criminal case and his psychiatrist long before the beating incident.

6

On cross-examination, Blatcher testified that he did not recall the name of the other deputy who was present at the shakedown, but that Deputy Jacob went into the cell with Sgt. Harvey, while the other two deputies searched the inmates outside the cell.

Plaintiff stated that, at the time of the incident, he had 26 different vitamins on his person, which the deputies could have thought to be contraband. He stated that his left fist was balled up, but he opened his hand as soon as Deputy Cowart asked him.

Blatcher stated that he continued to exercise lightly after the incident. He testified that Dr. Mauterer told him on October 12, 2004 that his soreness would clear up. He said that some of his injuries cleared up within a week or two but that his neck, lower back and eye problems did not resolve. Blatcher stated that the top of his head is still sore, but he does not believe that was caused by the incident.

2.    *Testimony of Jason Addison*

Jason Addison testified that he is currently incarcerated at David Wade Correctional facility, in Houma, Louisiana, having been convicted of aggravated second degree battery in August 2005. He stated that he was sentenced to six to twelve years in prison. Addison testified that he was in the Tangipahoa Parish Jail on October 7, 2004, awaiting trial on charges of armed robbery and aggravated second degree battery.

Addison testified that he could not see what was going on in Blatcher's cell, but he heard Deputy Cowart ask Blatcher what was in his hand. He testified that he saw

7

Blatcher's head hit the floor, he saw a deputy drag Blatcher out of the cell by his hair and his legs, and he saw blood by the toilet after Blatcher was gone.

Addison testified that he could not remember the name of the deputy who dragged Blatcher out of the cell by his hair, but that he was a lieutenant who had just started working at the prison.  He described this person as a black male, about five foot eight inches tall and heavy set.

Addison said the officers involved in the incident were Donald Boy [?], the new lieutenant, another new deputy who was shaking down the cell and "Bobby the commissary man."  Addison testified that the only act of touching he saw was when Blatcher was dragged out of the dorm and into the hallway by his hair.  He said he did not witness any punches. but that he "heard some licks" during the confrontation.

### 3.   *Testimony of Alvin Irving, Jr.*

Alvin Irving, Jr. testified that he is currently incarcerated at Hunt Correctional Institution, in St. Gabriel, Louisiana, because of a probation violation.  He testified that his probation was revoked on February 8, 2006.   He testified that he was convicted in August 2002 for illegal possession of stolen things and sentenced to ten years in prison. He said that at the time of the incident in question, he was serving part of his ten-year sentence at the Tangipahoa Parish jail.

8

Irving testified that he and Blatcher were in the cell together when Sgt. Harvey came in to do a shakedown.  He said they were told to get against the wall outside the cell, which they did.  He said that another deputy, whose name he could not recall, was "talking bad" to them and then the deputy asked plaintiff what he had in his hand.  Irving testified that Blatcher dropped the candy wrapper from his hand onto the floor and the deputy started shoving Blatcher in his back up against the wall for no reason.  He stated that Blatcher got into a shouting match with the deputy, but no punches were thrown.

Irving said the two deputies had plaintiff down on the floor on his knees and hands when Deputy Jacob came in, pulled Blatcher's head up by his hair, hit Blatcher twice and kneed Blatcher in the face twice.  Irving stated that he asked the deputies why they were using excessive force, because plaintiff had nothing but a candy wrapper and they had him restrained, and that the deputy told him to get back in the cell.  He said the deputy pushed him into the cell and closed the door.  He testified that the scuffle continued and there was a puddle of blood on the floor where Blatcher was still restrained.

On cross-examination, Irving testified that he and Blatcher had been cellmates for about four months.  He said they had been through shakedowns before with no incident.

Irving stated that he could not recall the name of the new, white deputy who told Blatcher and him to put their hands against the wall.  He said that after the new deputy asked plaintiff what was in his hand and plaintiff let the candy wrapper fall, the deputy

9

started shoving and kneeing plaintiff in the back.  He stated that Blatcher asked why they were doing that, but the two deputies did not respond.  He stated that there was a shoving match between the white deputy and Blatcher, but that Blatcher was not really pushing back, just standing still and trying to prevent the deputy from shoving him.  Irving said that, when words were exchanged, the deputies put plaintiff down on the floor, but that plaintiff had not tried to hit the deputies.

Irving testified that Blatcher was restrained on the floor when Sgt. Harvey and Deputy Jacob came out.  He said that Deputy Jacob raised plaintiff's head up by the hair, "socked him" twice and kneed him twice.

### 4.   *Samuel Harrison*

Although Samuel Harrison was served with a subpoena, he failed to appear at the hearing.  Blatcher stated that Harrison had given a written statement and he sought to introduce the statement in lieu of Harrison's testimony.  Harrison's written statement was not signed under oath or penalty of perjury.  Record Doc. No. 5.  Counsel for Dr. Mauterer objected to admission of the statement on the basis of hearsay.

### 5.   *Adam Banas*

Adam Banas is outside the subpoena power of this court.  Blatcher said he had been unable to locate Banas before the hearing.

B.      Defendants' Case-in-Chief Witness Testimony

      1.      *Testimony of Sergeant Lavoice Harvey, Jr.*

Sergeant Lavoice Harvey, Jr. testified that he is a supervisor at the Tangipahoa Parish Sheriff's Office and that Deputies Jacob and Cowart were under his supervision on October 7, 2004.

Sgt. Harvey testified that, on that date, he went with Deputies Jacob, Cowart and Ronnie Brown to shake down Cell Block B. He said he instructed Deputy Cowart to open the cell of Blatcher and Irving. He testified that he told the inmates that the deputies were there to perform a routine shakedown, and he asked the inmates to exit the cell. He said that he shook down the cell, while Deputies Cowart and Jacob shook down the inmates.

Sgt. Harvey testified that he heard Deputy Cowart say, "Put your hands on the wall." He said that Deputy Cowart repeated these instructions twice and that Cowart did not use profanities. He testified that he then heard a "scuffle" outside the cell. He stated that he was not immediately aware who was involved in the scuffle but that, when he exited the cell, he saw Blatcher swinging at Deputy Cowart.

Sgt. Harvey testified that Deputies Jacob and Cowart were trying to restrain Blatcher and that they told Blatcher to get on the ground. He said he grabbed Blatcher's arm to try to restrain him. He testified that he did not see anyone punch Blatcher or knee him in the face and that he did not punch Blatcher or knee him in the face.

11

Sgt. Harvey stated that, once Blatcher was taken down to the ground, the deputies lifted him up by his arms and walked him out of the cell.  He said that no one dragged Blatcher by his hair.  He stated that Deputy Jacob grabbed Blatcher's hair for a few seconds while trying to take him to the ground because plaintiff was acting violently, but that Blatcher was walked out of the cell.

Sgt. Harvey testified that Blatcher was taken to booking.  He said plaintiff had a small cut on his lower lip with a little blood, but he saw no other injuries.  He testified that no contraband was found, but that the deputies found 26 pills on Blatcher, which the nurse told him were vitamins and that, if they were taken in a large quantity, could have harmed Blatcher.

Sgt. Harvey testified that he prepared and signed a written statement on October 7, 2004 concerning the incident.  Defendants' Exh. 1.

       2.    *Testimony of Deputy Donald Jacob*

Deputy Donald Jacob testified that he is currently employed by the Tangipahoa Parish Sheriff's office, where he has been a deputy for seven years.  He said that Sgt. Harvey was his supervisor on October 7, 2004.

Deputy Jacob stated that Sgt. Harvey instructed him to shake down Blatcher's and Irving's cell.  He said that, when the prisoners exited the cell, they were instructed to put their hands on the wall and spread their legs.  He testified that he shook down Irving while

Deputy Cowart shook down Blatcher.  He stated that he heard Deputy Cowart tell Blatcher two or three times to put his hands on the wall and spread his legs but that Blatcher was not following the instructions.

Deputy Jacob said that he looked over and saw that Blatcher had "gone wild" and started swinging at Deputy Cowart.  He said Deputy Cowart "bear-hugged" Blatcher to try to gain control of him, but Deputy Cowart could barely handle plaintiff.  Deputy Jacob testified that, as Deputy Cowart and plaintiff were swaying back and forth, Deputy Jacob grabbed Blatcher in the only place he could, which was to grab Blatcher's hair for three to four seconds and pull him to the ground.  Deputy Jacob stated that he did not punch Blatcher in the face, eye or mouth and did not drag him out of the cell by his hair.

Deputy Jacob testified that he and Deputy Cowart could barely handle plaintiff because plaintiff "was just like a wild man" even after he was on the ground.  He stated that Sgt. Harvey came up when Blatcher was on the ground.  He testified that Deputy Cowart did not use any profanities during the incident.

Deputy Jacob stated that, once Blatcher was restrained, two or three deputies held Blatcher by the arms, walked him to booking and sat him on the bench.  He said Blatcher was not thrown on the bench.  He stated that the incident lasted about 30 to 40 seconds.  He testified that he had not had any other problems with Blatcher before this incident.

13

Deputy Jacob stated that he prepared and signed a written statement on the date of the incident.  Defendants' Exh. 2.

On cross-examination, Deputy Jacob testified that he never went into the cell and that he remained outside the cell to shake down Irving, while Sgt. Harvey went into the cell.  He stated that Deputy Cowart told plaintiff two or three times to get against the wall and that he did not know exactly what happened but "all of the sudden you went off, you started swinging . . . like a wild man."  He testified that Blatcher never put his hands on the wall.  Deputy Jacob said that, when plaintiff started swinging at Deputy Cowart, the first thing Deputy Cowart did was bear-hug plaintiff and the two were "tussling."  He stated that he grabbed Blatcher "by the head of your hair and we got you to the floor."

3.    *Testimony of Charlotte Lee*

Charlotte Lee testified that she is currently employed by Key Home Health and that she was previously employed as a nurse at the Tangipahoa Parish Jail for a little over a year.

Lee testified that she saw Blatcher very briefly on October 7, 2004 in the booking area.  She said he did not ask to see her on that date.

Lee stated that plaintiff came to the infirmary on October 8, 2004.  She said she obtained his vital signs and wrote down all the places where he reported soreness.  She testified that he was "okay."  She stated that "we had to drag it out of him why" he wanted

14

to see the doctor.  She said he kept looking out the window and would not make eye contact with the doctor.  Lee testified that Dr. Mauterer examined Blatcher as best he could.  She said she noticed no injuries and no blood.

Lee testified that Blatcher's next visit to the jail's health clinic was on October 12, 2004, when he complained of pain and soreness in multiple areas.  She stated that Dr. Mauterer tried to speak with Blatcher, but that Blatcher would not make eye contact and kept going off on tangents about how he had been wronged and how they were not helping him.  She described his attitude as "belligerent."

Lee said she observed no injuries.  She stated that this was not the first time she had heard plaintiff make these complaints.  She testified that Dr. Mauterer wrote a prescription for doxepin (also known as Sinequan)[2] to help plaintiff with sleep, pain, nervousness and agitation.  She said that Blatcher had previously been on that medication and had received a refill prescription on July 19, 2004.

---

[2]According to the <u>Physicians' Desk Reference</u>, Sinequan (generic name: doxepin hydrochloride) is "used in the treatment of depression and anxiety."

> It helps relieve tension, improve sleep, elevate mood, increase energy, and generally ease the feelings of fear, guilt, apprehension, and worry most people experience.  It is effective in treating people whose depression and/or anxiety is psychological, associated with alcoholism, or a result of another disease (cancer, for example) or psychotic depressive disorders (severe mental illness).

http://www.pdrhealth.com/drug_info/rxdrugprofiles/drugs/sin1406.shtml.

She testified that Blatcher was supposed to be taking his medication when he came to the jail infirmary on October 8 and 12, 2004.  She stated that Blatcher did not return to the infirmary after those dates.

On cross-examination, Lee said she had resigned from her work at the Tangipahoa Parish Jail to pursue a different avenue in her career.  She described plaintiff's belligerent behavior as "very loud, disruptive, almost making someone else feel slightly fearful.  No one can talk to you.  When you try to talk to someone that's belligerent, they don't hear what you're saying, they block out what you're saying, they just become wild, they're saying all kinds of things."

Lee stated that Blatcher was arguing and not listening when she and Dr. Mauterer were trying to talk to him and treat him.  She testified that plaintiff was upset and argumentative on October 8, 2004 when Dr. Mauterer diagnosed generalized soreness and did not prescribe any medication.

Lee said she did not recall plaintiff asking to go to the hospital during the October 2004 visits.  She stated that Dr. Mauterer tried to examine Blatcher but that Blatcher backed away and never gave the doctor a chance to examine him.

4.      *Testimony of Dr. Arthur Mauterer*

Dr. Arthur Mauterer testified that he had practiced general surgery in Baton Rouge, Louisiana for 35 years.  He stated that, when he retired from surgery, he went to Lallie Kemp Hospital[3] and practiced internal medicine for ten years.  He testified that he then opened a private practice in Amite, Louisiana, but remained connected to Lallie Kemp. He said that personnel at Lallie Kemp asked him to take the jail as part of his practice.

Dr. Mauterer stated that he went to the jail to see prisoners for about three hours per day from April 2004 until July 1, 2005.  He described the area where he sees prisoners as an infirmary with an office and an examining table.  He testified that he speaks to and examines the prisoners before issuing orders.  He stated that, if necessary, he sends requests for lab work and x-rays to Lallie Kemp.

Dr. Mauterer testified that Blatcher was seen as an outpatient in June 2004 at Rosenblum Hospital.[4]  He noted that Blatcher had a psychiatric evaluation by a staff psychiatrist at Rosenblum Hospital in April 2005, who diagnosed him with depressive disorder, antisocial personality traits and general anxiety.

Dr. Mauterer stated that he saw Blatcher at the jail in May 2004, when Blatcher stated that he had broken his nose playing basketball four years ago and complained that

---

[3]Lallie Kemp Regional Medical Center is located in Independence, Louisiana.

[4]Rosenblum Mental Health Center is located in Hammond, Louisiana.

17

he was now having headaches on the right side of his head and pain under his nose.  Dr. Mauterer said he sent plaintiff to Lallie Kemp for a CT scan of his sinuses.  Dr. Mauterer prescribed 50 mg. of Sinequan before bed to help Blatcher sleep.  He testified that this amount of Sinequan is considered an analgesic dose and is used to raise the patient's low-level pain threshold.  He stated that the x-ray revealed a very minimal amount of sinusitis, if any, and no facial fractures.

Dr. Mauterer testified that he saw plaintiff again in May 2004 for a sprained right ankle and a bruised right eye.  He said Blatcher continued to complain of headaches, but that he had already obtained a CT scan of plaintiff's sinuses.  Dr. Mauterer said that he ordered x-rays of Blatcher's ankle but that plaintiff was not taken to the hospital until June 9, 2004 because of a delay in transportation.  Dr. Mauterer said plaintiff was seen at the hospital for pressure induced headaches, body aches and a sprained ankle.  He stated that the emergency room doctor gave Blatcher Midrin for his headaches.

Dr. Mauterer testified that Blatcher came to the infirmary on July 19, 2004, complaining that his right ankle was swollen and he had pressure in the top of his head.  Dr. Mauterer testified that plaintiff had a slightly swollen right ankle and was "very, very belligerent," meaning that he was "surly, curt, snapping, almost engaging into a fight."  He stated that this behavior does not affect his treatment and that he sees it all the time from prisoners.

18

Dr. Mauterer testified that he next saw Blatcher on October 8, 2004, when plaintiff again complained of soreness in the top of his head, neck, back and ankle and said that he had been grabbed by his hair.  Dr. Mauterer testified that Blatcher was not very cooperative, but he was able to examine plaintiff.  He said he examined Blatcher's head and face, but nothing was wrong with plaintiff's scalp and the doctor did not see a bloody lip or any facial injury.  He stated that plaintiff basically had no injuries and no treatment was indicated.  He said generalized soreness does not mean illness or injury.

Dr. Mauterer testified that Blatcher returned on October 12, 2004, having stated on his medical request form in capital letters, "I am in pain and it is killing me."  He said plaintiff made the same complaints of right ankle pain and head pain as before and that plaintiff had a very belligerent attitude.  He did not recall exactly what Blatcher was saying but stated that it was not important because plaintiff was ranting.  Dr. Mauterer said he examined Blatcher and found no visible signs of injury.  He stated that he again prescribed 50 milligrams of Sinequan.

Dr. Mauterer said he did not see Blatcher again until April 2005 when Blatcher requested a refill on his prescription and went to Rosenblum Hospital.

On cross-examination, Dr. Mauterer explained that an examination consisted of observing the patient walk into the room, watching him move and looking at his head,

face, hands, arms and legs.  He stated that Blatcher's behavior was "very ugly, belligerent in your attitude and you really didn't act as though you wanted to be examined."

Dr. Mauterer defined diagnosis as a declaration of an injury or illness found, but the patient has to have something wrong with him.  He stated that he looked at Blatcher's hair and put his hands on plaintiff's head, after Blatcher finally agreed to let him look, and there was no hair missing and no blood or anything else coming from the scalp.

C.    Exhibits

Defendants' Exhibits 1 and 2 were received into evidence.  Plaintiff's medical records, previously filed in the court's record as Record Doc. No. 11, were received into evidence as Plaintiff's Exhibit 1. An unsworn statement by Samuel Harrison was proffered as Plaintiff's Exhibit 2.

Defendants' Exhibit 1 is a Tangipahoa Parish Jail Disciplinary Report dated October 7, 2004, and signed by Sgt. Harvey, which corroborates Sgt. Harvey's testimony in every respect.  The report summarizes the incident and indicates that Blatcher engaged in a physical confrontation with Deputies Cowart and Jacob.  Sgt. Harvey's report also states that plaintiff sustained "a small cut on his lower lip," for which he was taken to the nurse's station, where he refused treatment.  The report also states that the deputies found 26 pills while searching Blatcher and that the nurse told them the pills were vitamins which, if taken in a large amount, could be harmful.

20

Defendants' Exhibit 2 is a Tangipahoa Parish Jail Disciplinary Report dated October 7, 2004, and signed by Deputy Jacob.  It corroborates Deputy Jacob's testimony in every respect.  The report summarizes the incident and indicates that Blatcher refused to be searched during the shakedown and threw a punch at Deputy Cowart.

Plaintiff's proffered Exhibit 2, the unsworn, hearsay statement of Samuel Harrison, was not admissible and was not received into evidence.  Fed. R. Evid. 603, 802.

Plaintiff's medical records, Plaintiff's Exhibit 1, were essentially as summarized in the testimony of Lee and Dr. Mauterer.  The medical records show that, on May 13, 2004, plaintiff complained of severe headaches, sleeplessness and a sharp pain in his nose.  Dr. Mauterer diagnosed right facial pain, questionable sinusitis and insomnia.  A CT scan of plaintiff's facial bones on May 21, 2004 revealed a very minimal degree of mucosal thickening in both ethmoid sinuses and was otherwise normal.

On May 31, 2004, Blatcher complained in a medical request form of a sprained right ankle, bruised right eye and continuous headaches.  Although the records do not confirm that Dr. Mauterer examined plaintiff following that request, he wrote a prescription for Sinequan on June 4, 2004.

Blatcher completed an undated medical request form, complaining of headaches, body aches and a sprained right ankle.  A notation on the form by Lee states that plaintiff

21

was taken to the hospital on June 9, 2004.  A discharge instructions sheet from the hospital on that date indicates Blatcher was given Midrin as needed for headaches.

Plaintiff's medical records also reveal that he was examined by Dr. Mauterer on July 19, 2004.  Lee noted that he complained of a swollen, painful right ankle, but he walked into the clinic without any difficulty.  He requested a refill of Sinequan.  Dr. Mauterer noted that Blatcher was "acting very belligerent."  He diagnosed a slightly swollen right ankle, ordered x-rays of the ankle and wrote a prescription for Sinequan. The x-ray results on July 30, 2004 were normal.

On August 13, 2004, a doctor at Lallie Kemp Medical Center diagnosed right ankle pain and prescribed Anaprox.

Plaintiff submitted a medical request form dated October 7, 2004, in which he complained of severe soreness in the top of his head, neck, back and left ribs.  He said that his right eye was light sensitive and hurt badly when he moved it, his right ankle hurt and he had a deep cut on his lip and little cuts inside his mouth.

Physical examination by Dr. Mauterer on October 8, 2004 revealed generalized soreness following an altercation with deputies the previous day.  Dr. Mauterer did not prescribe any medication or order any tests.

At 6:00 p.m. on October 8, 2004, Blatcher submitted another medical request form, stating "I am in pain and it is killing me!!!"  He was seen in the infirmary on October 12,

2004.  Lee noted that plaintiff complained of soreness in his neck, burning in his mouth when he eats and pain in his right ankle and his head.  Dr. Mauterer noted that Blatcher had multiple complaints, a belligerent attitude, no visible signs of injury and no injuries inside his mouth.  He prescribed doxepin.

II.     FINDINGS OF FACT AND CONCLUSIONS OF LAW

       A.     Plaintiff's Excessive Force Claim

       Blatcher was a pretrial detainee on October 7, 2004.  Thus, his claim that Tangipahoa Parish sheriff's deputies used excessive force against him is properly characterized as asserting a violation of his substantive due process rights under the Fourteenth Amendment.  Petta v. Rivera, 143 F.3d 895, 911 (5th Cir. 1998) ("[W]here a plaintiff's excessive force claim, whether he be a prisoner, arrestee, detainee, or an innocent bystander of tender years, falls outside the specific protections of the Bill of Rights, that plaintiff may still seek redress under the due process clause of the Fourteenth Amendment.") (citing Graham v. Connor, 490 U.S. 386, 395 n.10 (1989)); accord Gutierrez v. City of San Antonio, 139 F.3d 441, 452 (5th Cir. 1998).

       Under the Fourteenth Amendment standard, the court must ask whether defendants' "actions caused [plaintiff] any injury, were grossly disproportionate to the need for action under the circumstances and were inspired by malice rather than merely careless or unwise excess of zeal so that [they] amounted to an abuse of official power that shocks

the conscience." Petta, 143 F.3d at 902 (citation omitted).  The "'extent of injury is one factor' to be considered [along] with 'the need for application of force, the relationship between that need and the amount of force used' and other factors, . . . [but] the extent of injury is only one relevant factor and cannot be exclusively determinative under the . . . substantive due process approach." Id. (quoting Hudson v. McMillian, 503 U.S. 1, 7 (1992)).

To the extent Blatcher asserts an excessive force claim under the Eighth Amendment and Section 1983, the appropriate inquiry is "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." Hudson, 503 U.S. at 6; accord Petta, 143 F.3d at 901; Flowers v. Phelps, 956 F.2d 488, 491 (5th Cir. 1992).  Plaintiff need not show a significant injury to establish a constitutional violation; however, the extent of the injury may be considered in determining whether the force used was malicious, wanton or unnecessary. Hudson, 503 U.S. at 7; Flowers, 956 F.2d at 491.  In addition, "[t]he Eighth Amendment's prohibition of cruel and unusual punishment excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort 'repugnant to the conscience of mankind.'" Siglar v. Hightower, 112 F.3d 191, 193 (5th Cir. 1997) (quoting Hudson, 503 U.S. at 9-10).

The law "require[s] a plaintiff asserting an excessive force claim to have suffered at least some form of injury, . . . we do not permit a cause of action for every contact between a citizen and a police officer.  In just about every conceivable situation, some amount of force or contact would be too nominal to constitute a constitutional violation.  When the force used is insufficient to satisfy the legal standard necessary for recovery, the amount of force is de minimis for constitutional purposes."  Williams v. Bramer, 180 F.3d 699, 703 (5th Cir. 1999) (quotation omitted).  To determine whether injury caused by excessive force is more than de minimis for constitutional purposes, the context in which the force was used and all the surrounding circumstances must be examined.  Id.

In finding the facts as to which the foregoing legal principles apply in this case, I find that Blatcher has failed to establish either a Fourteenth or an Eighth Amendment violation for the following reasons.  First and most importantly, I find that Blatcher is not a credible witness and that his testimony cannot be credited.  His testimony was in conflict with his own witnesses, Jason Addison and Alvin Irving Jr., who themselves provided limited, sketchy testimony, the credibility of which itself was suspect. In addition, Blatcher is a convicted armed robber whose conviction may properly be considered in assessing his lack of credibility.  Fed. R. Evid. 609(a)(1).  His testimony was in conflict with the testimony of the other, credible witnesses and the documentary exhibits, none of which support or corroborate the kind of injuries or other events involving the allegedly

excessive force about which he testified.  In short, plaintiff's story about the incident that led to the allegedly excessive force in this case was self-serving, uncorroborated by any other credible evidence and cannot be believed.

On the other hand, Sgt. Harvey, Deputy Jacob, Dr. Mauterer and Nurse Lee were entirely credible.  Their demeanor and their manner of testifying were calm, detached, detailed and highly professional.  Viewed in the entirety of the circumstances, I am convinced that their account is credible.  Their testimony and the documentary evidence corroborate each other without substantial discrepancies.  Thus, I find the testimony of Sgt. Harvey, Deputy Jacob, Dr. Mauterer and Nurse Lee credible and the testimony of plaintiff, Addison and Irving not credible.

Based on the credible testimony of the witnesses and the other record evidence, I find that the Tangipahoa Parish sheriff's deputies used reasonable force during the incident when Blatcher failed to cooperate in a shakedown by refusing to obey orders to place his hands on the wall and by becoming physically hostile, including swinging punches at the deputies.  The deputies grabbed him in an effort to restrain him.  Indeed, Deputy Jacob exhibited creditable restraint in the face of Blatcher's hostile behavior toward Deputy Cowart. Blatcher's own aggressive and hostile behavior caused the physical contact with the deputies.

Under these circumstances, the deputies used only the force necessary to restrain Blatcher.  Nothing about the minimal injuries for which Blatcher was later treated indicates that any of the deputies used force that was excessive to its need.  Certainly, the deputies did not strike Blatcher.  The credible testimony makes clear that plaintiff was subjected to minor physical contact by the deputies, a response that Blatcher himself initiated, and that the force used by the deputies resulted in very minor injuries and was in no way malicious or sadistic.  In short, because the deputies' physical contact with Blatcher was reasonable under the circumstances, plaintiff cannot establish the essential elements of his excessive force claim under Section 1983.

For the reasons discussed above, no violation of a constitutional right occurred because the deputies of the Tangipahoa Parish sheriff acted under exigent circumstances that justified the reasonable, particular physical contact they used.  Applying this standard, defendants' conduct must be judged objectively reasonable under these circumstances, and judgment must be entered in favor of defendants, dismissing plaintiff's claim of excessive force with prejudice.

B.    Plaintiff's Medical Care Claim

Blatcher also claims that his medical care for the injuries suffered in the incident with the deputies was constitutionally inadequate. Before the Fifth Circuit's decision in Hare v. City of Corinth, 74 F.3d 633 (5th Cir. 1996), it appeared that prison officials must provide pretrial detainees with reasonable medical care unless the failure to provide it was reasonably related to a legitimate government interest. Bell v. Wolfish, 441 U.S. 520, 539 (1979); Mayweather v. Foti, 958 F.2d 91 (5th Cir. 1992); Cupit v. Jones, 835 F.2d 82, 85 (5th Cir. 1987). The inquiry was "whether the denial of medical care . . . was objectively reasonable in light of the Fourteenth Amendment's guarantee of reasonable medical care and prohibition on punishment of pretrial detainees." Pfannstiel v. City of Marion, 918 F.2d 1178, 1186 (5th Cir. 1990), abrogated on other grounds as recognized in Martin v. Thomas, 973 F.2d 449, 455 (5th Cir. 1992).

In Hare, however, the Fifth Circuit held:

(1) that the State owes the same duty under the Due Process Clause and the Eighth Amendment to provide both pretrial detainees and convicted inmates with basic human needs, including medical care and protection from harm, during their confinement; and (2) that a state jail official's liability for episodic acts or omissions cannot attach unless the official had subjective knowledge of a substantial risk of serious harm to a pretrial detainee but responded with deliberate indifference to that risk.

Hare, 74 F.3d at 650. The Fifth Circuit explained that for the Bell "reasonable relationship" test to be applicable, the pretrial detainee must be able to show that a prison

official's act either "implement[s] a rule or restriction or otherwise demonstrate[s] the existence of an identifiable intended condition or practice" or that the "official's acts or omissions were sufficiently extended or pervasive, or otherwise typical of extended or pervasive misconduct by other officials, to prove an intended condition or practice." Id. at 645.  If the pretrial detainee is unable to prove either, the incident will be considered to be an episodic act or omission and the deliberate indifference standard enunciated in Estelle v. Gamble, 429 U.S. 97, 104 (1976), will apply.  Id.

In Estelle, the Supreme Court held that a convicted prisoner may succeed on a claim for damages under 42 U.S.C. § 1983 for inadequate medical care only if he demonstrates that there has been "deliberate indifference to serious medical needs" by prison officials or other state actors.  Only deliberate indifference, "an unnecessary and wanton infliction of pain . . . or acts repugnant to the conscience of mankind," constitutes conduct proscribed by the Eighth Amendment.  Id. at 105-06; accord Gregg v. Georgia, 428 U.S. 153, 182-83 (1976); Hare, 74 F.3d at 650.  "Deliberate indifference" means that a prison official is liable "only if he knows that the inmates face a substantial risk of serious harm and [he] disregards that risk by failing to take reasonable measures to abate it." Farmer v. Brennan, 511 U.S. 825, 847 (1994). The Farmer definition applies to Eighth Amendment medical claims.  Reeves v. Collins, 27 F.3d 174, 176 (5th Cir. 1994).

An inmate must satisfy two requirements to demonstrate that a prison official has violated the Eighth Amendment.  "First, the deprivation alleged must be, objectively, 'sufficiently serious'; a prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities."  Farmer, 511 U.S. at 834 (quotation omitted).  Thus, plaintiff must show deliberate indifference to his "serious medical needs" to satisfy this prong.  Wilson v. Seiter, 501 U.S. 294, 297 (1991); Mendoza v. Lynaugh, 989 F.2d 191, 193 (5th Cir. 1993).

Although the United States Court of Appeals for the Fifth Circuit has not defined "serious medical need," a majority of the other circuits have adopted the following definition.  "A 'serious' medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  Gutierrez v. Peters, 111 F.3d 1364, 1373 (7th Cir. 1997) (citing Mahan v. Plymouth County House of Corrections, 64 F.3d 14, 18 (1st Cir. 1995); Monmouth County Correctional Inst. Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987); Sheldon v. Pezley, 49 F.3d 1312, 1316 (8th Cir. 1995); Riddle v. Mondragon, 83 F.3d 1197, 1202 (10th Cir. 1996); Hill v. Dekalb Reg'l Youth Detention Ctr., 40 F.3d 1176, 1186 (11th Cir. 1994)).  A medical condition is "serious" when "the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'"  McGuckin v. Smith, 974 F.2d 1050, 1060

30

(9th Cir. 1992), <u>overruled in part on other grounds by WMX Tech., Inc. v. Miller</u>, 104 F.3d 1133, 1135 (9th Cir. 1997).

Second, plaintiff must establish that defendant possessed a culpable state of mind. <u>Farmer</u>, 511 U.S. at 838 (citing <u>Wilson v. Seiter</u>, 501 U.S. 294, 298 (1991)).  A prison official cannot be held liable "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  <u>Id.</u> at 837.  "Mere negligence or a failure to act reasonably is not enough.  The officer must have the subjective intent to cause harm."  <u>Mace v. City of Palestine</u>, 333 F.3d 621, 626 (5th Cir. 2003).  If the court finds that one of the components of the test is not met, it need not address the other component.  <u>Davis v. Scott</u>, 157 F.3d 1003, 1005 (5th Cir. 1998).

> The Supreme Court has recently reaffirmed that "deliberate indifference" is a <u>stringent</u> standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action.  <u>Board of the County Commissioners of Bryan County, Oklahoma v. Brown</u>, 520 U.S. 397, 117 S.Ct. 1382, 1391 (1997) . . . .  The "deliberate indifference" standard permits courts to separate omissions that "amount to an intentional choice" from those that are merely "unintentionally negligent oversight[s]."

<u>Southard v. Texas Bd. of Crim. Justice</u>, 114 F.3d 539, 551 (5th Cir. 1997) (citations omitted) (emphasis added).  "'Subjective recklessness,' as used in the criminal law, is the appropriate test for deliberate indifference."  <u>Norton</u>, 122 F.3d at 291.

In the instant case, plaintiff's testimony establishes that nothing more than episodic acts or omissions as defined in <u>Hare</u> are at issue in this case. Thus, the "deliberate indifference" standard applies and plaintiff must establish that defendant Dr. Mauterer knew that he faced a substantial risk of serious harm and disregarded that risk by failing to take reasonable measures to abate it. In this case, Blatcher fails completely to prove facts sufficient to establish deliberate indifference.

First, the injuries that Blatcher described did not present a serious medical need that posed a substantial risk of harm during his incarceration. Plaintiff's testimony concerning the extent of his injuries suffered during the confrontation was not credible and was not corroborated by the credible testimony of Dr. Mauterer and Nurse Lee or by the contemporaneous medical records. I find that the injuries suffered by Blatcher during the altercation were de minimis and had no long-term effects. <u>See</u> <u>Lusk v. Dallas County Sheriff's Dep't</u>, No. 3:00-CV-0662L, 2002 WL 31757706, at *4 (N.D. Tex. Nov. 29, 2002) (Lindsay, J.) (herniated disc and degenerative spinal disease <u>not</u> serious medical needs); <u>Nelson v. Rodas</u>, No. 01CIV7887RCCAJP, 2002 WL 31075804, at *14 (S.D.N.Y. Sept. 17, 2002) (Peck, M.J.) (back spasms and pain not a serious medical need); <u>Solomon v. Moore</u>, No. 97 Civ. 0201(KTD), 2000 WL 385521, at *2-3 (S.D.N.Y. Apr. 14, 2000) (Duffy, J.) (when plaintiff was able to walk and function normally despite neck, back and groin pains, he had no serious medical needs).

The credible testimony and medical records establish that plaintiff suffered only a minor cut and generalized soreness with no visible signs of injury and no long-term effects as a result of his altercation with the deputies.  Blatcher himself testified that the cuts in his mouth healed in about a week, his ankle took about two weeks to heal and the pain in his eyes went away.  He testified that he has not received or requested any further treatment for his eyes, back or neck at either the Tangipahoa or the LaSalle jail, which indicates that his testimony about having serious, long-term injuries is not credible.

Even assuming (although certainly not deciding) that Blatcher's injuries presented a serious medical need, the credible evidence negates any inference of deliberate indifference by Dr. Mauterer.  Blatcher's own testimony, as well as that of Dr. Mauterer and Nurse Lee, confirmed by the medical records, shows that he received constitutionally adequate medical care on the day after the incident and again four days later.  Plaintiff was examined by a doctor in response to his complaints and given a prescription for doxepin. In the reasonable exercise of his professional judgment, Dr. Mauterer found no indications that further treatment was needed.

Contentions like Blatcher's that amount to a mere disagreement with the speed, quality or extent of medical treatment, or even negligence, do not give rise to a Section 1983 claim.  "[A]lthough inadequate medical treatment may, at a certain point, rise to the level of a constitutional violation, malpractice or negligent care does not."  Stewart v.

Murphy, 174 F.3d 530, 534 (5th Cir. 1999) (citation omitted) (active treatment of prisoner's serious medical condition, which ultimately resulted in death, does not constitute deliberate indifference, even if treatment was negligently administered); see Norton, 122 F.3d at 291-92; Varnado v. Lynaugh, 920 F.2d 320, 321 (5th Cir. 1991); Mendoza, 989 F.2d at 193 (prisoner's disagreement with the type or timing of medical services provided cannot support a Section 1983 claim); Wesson v. Oglesby, 910 F.2d 278, 284 (5th Cir. 1990) (allegations establishing provision of medical treatment found inconsistent with inference of deliberate indifference).  Therefore, Blatcher has failed to prove constitutionally inadequate medical care and judgment must be entered in favor of Dr. Mauterer, dismissing plaintiff's claims with prejudice.

## RECOMMENDATION

For all of the foregoing reasons, **IT IS RECOMMENDED** that plaintiff's claims against all defendants be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendations in a magistrate judge's report and recommendation within ten (10) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with

notice that such consequences will result from a failure to object.  <u>Douglass v. United</u>

<u>Servs. Auto. Ass'n</u>, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).


New Orleans, Louisiana, this <u>  15th  </u> day of May, 2006.


JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE

35